**E-Filed 2/23/06**

NOT FOR CITATION

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

|  |  |
|---|---|
| EDWARD L. SCARFF, et al., | Case Number C 03-03394 JF (PVT) |
| Plaintiffs, | C 03-04829 JF (PVT) |
| v. | ORDER[1] RE MOTIONS HEARD ON JANUARY 6, 2006 |
| WELLS FARGO BANK, N.A., et al., |  |
| Defendants. |  |

On January 6, 2006, the Court heard oral argument on five motions in the instant action: (1) Defendant Comerica Bank ("Comerica") moves for partial summary adjudication on the issue of damages; (2) Defendants Wells Fargo Bank, N.A. ("Wells Fargo") and Carol Barber ("Barber") move for summary judgment on Plaintiffs' third, fourth, sixth, ninth, eleventh, twelfth, and fourteenth claims; (3) Defendant Kelly Hvegholm ("Hvegholm") moves for summary judgment on Plaintiffs' third and fourth claims; (4) Defendants Intuit Inc. ("Intuit"), Computing Resources Inc. ("CRI"), and Lisa Ciccotti ("Ciccotti") move for summary judgment on Plaintiffs' third and fourth claims (Wells Fargo, Barber, and Hvegholm join in this motion);

---

[1] This disposition is not designated for publication and may not be cited.

1   (5) Wells Fargo, Intuit, CRI, Barber, and Ciccotti move to exclude the expert declarations of

2   John Britt ("Britt"), Vicki Lambert ("Lambert"), and David Moore ("Moore") (Comerica joins in

3   this motion as to the declarations of Britt and Moore; Hvegholm joins as to the declaration of

4   Lambert).

5       On January 11, 2006, in light of the proximity of the then-scheduled trial date, the Court

6   issued a Memorandum of Intended Disposition.  This order sets forth the reasoning underlying

7   the Memorandum.

8

9                                **I. BACKGROUND**

10      The general background of the present action is described in the Court's Amended Order

11  Re Motions to Withdraw Reference to the Bankruptcy Court and Motions to Dismiss, dated June

12  18, 2004 and its Order Granting in Part and Denying in Part Motions to Dismiss and to Strike

13  Portions of the Consolidated Amended Complaint, dated May 23, 2005 ("Order of May 23,

14  2005").  This action arises out of alleged "credit line" and "payroll" schemes, through which, for

15  approximately a decade, Carol Huang ("Huang") embezzled millions of dollars from a number of

16  banks, financial institutions, companies, and/or individuals.  Plaintiff Edward L. Scarff ("Scarff")

17  had a career as a successful businessman for many years, which included serving as President and

18  Chief Operating Officer of Transamerica Corporation and as a partner in several investment

19  firms.  Huang was employed as a bookkeeper for two of these investment firms, Plaintiffs Scarff,

20  Sears & Associates ("SSA") and Pentoga Partners ("Pentoga").

21      In the fall of 2002, after Huang's alleged embezzlement came to light, Comerica and

22  Wells Fargo filed suit against Scarff and the Scarff Trust (which guaranteed Scarff's loans) in the

23  Santa Clara Superior Court, seeking to collect millions of dollars in loan advances made by the

24  banks, plus unpaid interest, attorneys' fees, and costs.  Plaintiffs denied liability and, on

25  December 24, 2002, brought several claims against Comerica and other Defendants in the state

26  court action.

27      On July 21, 2003, Plaintiffs Scarff, Nancy Scarff, SSA, and Pentoga filed their first

28  original complaint in the instant federal action.  The final Consolidated Amended Complaint

                                              2

1    ("CAC"), the allegations of which are at issue in the pending motions, was not filed until August

2    16, 2004.  In that pleading, Plaintiffs allege fifteen claims for relief against various groups of

3    Defendants, including Wells Fargo, Comerica, Bank of America Corp. ("Bank of America"),

4    Fidelity National Title Co. ("Fidelity"), CRI, Intuit, Hvegholm, Barber, Joan Burtzel ("Burtzel"),

5    and Ciccotti.[2]  In its Order of May 23, 2005, the Court dismissed, restricted the scope of, or

6    limited to specific Plaintiffs certain claims against Wells Fargo, Comerica, Bank of America,

7    Fidelity, CRI, Intuit, Hvegholm, Barber, Burtzel, and Ciccotti.  On June 14, 2005, the Court

8    dismissed Fidelity as a Defendant in this action.  Bank of America has entered into settlement

9    with Plaintiffs, the details of which are unknown to the Court.

10       By order dated December 16, 2005, the Court denied Comerica's motion for summary

11   judgment as to Scarff's ninth and eleventh claims and Burtzel's motion for summary judgment as

12   to Scarff's ninth, eleventh, and twelfth claims.  Neither Comerica nor Burtzel moved for

13   summary judgment as to the fifteenth claim, for declaratory relief.  Accordingly, the claims

14   remaining against Comerica are the ninth, eleventh, and fifteenth, and the claims remaining

15   against Burtzel are the ninth, eleventh, twelfth, and fifteenth.  The remaining Defendants now

16   move for summary judgment or partial summary judgment on all claims except the fifteenth.  In

17   addition, Comerica moves for partial summary adjudication on the issue of damages, and several

18   Defendants move to exclude certain expert declarations.

19

20                                    **II. LEGAL STANDARD**

21       A motion for summary judgment should be granted if there is no genuine issue of

22   material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

23   56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears

24   the initial burden of informing the Court of the basis for the motion and identifying the portions

25   of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that

26

27       [2] Additionally, Huang is named as a Defendant in the caption of the CAC, but none of the
28   claims is asserted expressly against her.

                                              3
Case No. C 03-03394 JF (PVT) and C 03-04829 JF (PVT)
ORDER RE MOTIONS HEARD ON JANUARY 6, 2006
(JFLC1)

1    demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S.

2    317, 323 (1986).

3        If the moving party meets this initial burden, the burden shifts to the non-moving party to

4    present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e);

5    *Celotex*, 477 U.S. at 324.  A genuine issue for trial exists if the non-moving party presents

6    evidence from which a reasonable jury, viewing the evidence in the light most favorable to that

7    party, could resolve the material issue in his or her favor. *Anderson*, 477 U.S. 242, 248-49;

8    *Barlow v. Ground*, 943 F.2d 1132, 1134-36 (9th Cir. 1991).

9        "When the nonmoving party has the burden of proof at trial, the moving party need only

10   point out 'that there is an absence of evidence to support the nonmoving party's case.'"

11   *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477

12   U.S. 317, 325 (1986)).  Once the moving party meets this burden, the nonmoving party may not

13   rest upon mere allegations or denials, but must present evidence sufficient to demonstrate that

14   there is a genuine issue for trial. *Id.*

15       The standard applied to a motion seeking partial summary judgment is identical to the

16   standard applied to a motion seeking summary judgment of the entire case. *Urantia Foundation*

17   *v. Maaherra*, 895 F.Supp. 1335, 1335 (D. Ariz. 1995).

18

19                                   **III. DISCUSSION**

20   **1.    Comerica**

21       On December 5, 2005, Comerica moved for partial summary adjudication on the issue of

22   damages, arguing that a significant portion of Scarff's damages claims are barred by the two- and

23   three-year statutes of limitation applicable to his negligence and fraud claims, respectively.  On

24   the same date, Comerica filed a motion for administrative relief to amend the scheduling order

25   and to permit it to file the instant motion.  Plaintiffs did not file opposition to the motion for

26   administrative relief.  On December 19, 2005, the Court granted Comerica's motion for

27   administrative relief and scheduled the hearing on the instant motion for January 6, 2006.

28

4

1    ***a.   The Court properly granted Comerica's motion for administrative relief to amend***
2    ***the scheduling order***

3    Scarff first argues that the Court erred in granting Comerica's motion for administrative

4    relief to amend the scheduling order.  In moving to amend the scheduling order, Comerica argued

5    that discovery responses produced by Scarff on October 25, 2005 "made apparent for the first

6    time that over half of the total amount of the damages Scarff alleges is barred by the two and

7    three year statutes of limitations."  Scarff argues that this basis for amending the scheduling order

8    is not supported by the record.  He contends that his May 9, 2005 responses to Bank of

9    America's first set of interrogatories—which provided a list of then-known unauthorized

10   transactions, including transactions between 1997 and 1999—provided Comerica with sufficient

11   notice of the transactions which Comerica now argues are barred by relevant statutes of

12   limitations.  Declaration of Philip L. Gregory in Opposition to the Motion for Partial Summary

13   Adjudication of Defendant Comerica Bank (hereinafter "Gregory Decl. A"), Ex. 2.

14   For several reasons, the Court concludes that it properly granted Comerica's motion for

15   administrative relief to amend the scheduling order.  First, as noted above, Plaintiffs did not file

16   opposition to the motion for administrative relief.  Comerica filed its motion for administrative

17   relief on December 5, 2005.  Pursuant to Civil Local Rule 6-3(c), opposition to a motion to

18   change time must be filed "no later than the third court day after receiving the motion."  This

19   filing deadline applies to opposition for miscellaneous administrative requests.  Civ. L. R. 7-

20   10(2).  The Court granted Comerica's motion for administrative relief on December 19, 2005,

21   fourteen days after the motion was filed.  Second, Scarff's May 9, 2005 responses to

22   interrogatories did not identify specifically the transactions on which Scarff would base his

23   claims for damages— instead, they identified only the "transaction[s] conducted and/or arranged

24   by Carol Huang without [Scarff's] authorization that resulted in the removal of money from any

25   of [his] bank account(s)."  Gregory Decl. A, Ex. 2.  Third, the issue of whether any portion of the

26   damages alleged by Scarff is barred by a statute of limitations is an issue that necessarily would

27   arise at trial.  Thus, it is in the interest of judicial efficiency for the Court to hear Comerica's

28   substantive motion concurrently with the motion of Intuit et al., which includes a similar

5

1   argument about relevant statutes of limitations.

2       ***b. Discovery rule***

3       On October 25, 2005, in response to Wells Fargo's first set of interrogatories, Scarff

4   provided a detailed list of dates and interest payments he alleges in connection with his claim for

5   damages. *See* Declaration of Jonathon R. Bass in Support of Wells Fargo Bank N.a.'s, Carol

6   Barber's, Intuit Inc.'S, Computing Resources, Inc.'S and Lisa Ciccotti's Motions for Summary

7   Judgment (hereinafter "Bass Decl."), Ex. 22, pp. 13-25. This list includes payments made

8   between June 25, 1997 and September 3, 2002. *Id.* Scarff first filed claims against Comerica

9   and the other Defendants in this action on December 24, 2002. Accordingly, Comerica contends

10  that the two-year statute of limitations for negligence bars damages claims for transactions that

11  occurred prior to December 24, 2000, *see* Cal. Code Civ. Proc. § 339, and the three-year statute

12  of limitations for fraud claims bars damages claims for transactions conducted prior to December

13  24, 1999, *see* Cal. Code Civ. Proc. § 338.[3] In response, Scarff argues that the discovery rule,

14  which can delay the start of a limitations period, applies to Scarff's claims for damages because

15  Scarff timely filed his claim after he discovered Huang's scheme.

16      The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or

17  has reason to discover, the cause of action." *Norgart v. Upjohn Co.,* 21 Cal.4th 383, 397 (1999).

18  Comerica argues that the relevant periods of limitation begin to run when the plaintiff "could

19  have discovered" the claim with reasonable diligence. The only case cited by Comerica that

20

21      [3] In its reply brief, Comerica represents to the Court that:

22
        The "discovery rule" is codified in section 338(d) and provides that a cause of
23      action for fraud or mistake "is not to be deemed to have accrued until the
        discovery, by the aggrieved party *or his or her agent*, of the facts constituting the
24      fraud or mistake." C.C.P. 338(d) (emphasis added).

25
        This is a misrepresentation of the law: While clause "or his or her agent" is included in
26  sections (c), (e), and (f) of California Code of Civil Procedure § 338, it is notably absent from
    section (d). While the fact that the additional clause not only is included but also has been
27  emphasized causes the Court some concern, the Court will give counsel the benefit of the doubt
    and presume that the addition of this clause was inadvertent.

28

6

1  includes the rule that the limitations period begins when the claim "with reasonable diligence

2  could have been discovered" by the plaintiff is a case of *professional negligence. Electronic*

3  *Equipment Express, Inc. v. Donald H. Seiler & Co.*, 122 Cal.App.3d 834, 855 (1981).  Comerica

4  also cites *Norgart v. Upjohn Co.* for the proposition that the limitations period begins to run

5  when the plaintiff "could have discovered" the claim with reasonable diligence.  However, the

6  *Norgart* court held that a plaintiff has "reason to discover the cause of action when he has reason

7  at least to suspect a factual basis for its elements," which is defined as when a plaintiff has

8  "'notice or information of circumstances to put a reasonable person *on inquiry.*'" *Id.* at 398

9  (quoting *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1110 (1998)) (italics in original).  In *Kline v.*

10  *Turner*, another case cited by Comerica, the court held that the plaintiff was "reasonably on

11  inquiry" because he had notice of "an inexplicable act" and "should reasonably have suspected a

12  possible explanation [that] was something other than negligence." *Kline*, 87 Cal.App.4th 1369,

13  1375 (2001).

14        Considering the facts in the light most favorable to the Plaintiffs, a reasonable jury could

15  conclude that Scarff did not have notice of facts that would have put a reasonable person on

16  inquiry, and that he would not have discovered such facts through reasonable diligence.  Scarff

17  had remarkably little contact with employees of Comerica.  Burtzel, who originally solicited

18  business from Scarff, met with Scarff in person only twice, the first time at his office sometime

19  after Scarff's initial meeting with a Comerica representative in June, 1997, and the second time

20  over lunch in 1997 or 1998.  *See* Declaration of Martin H. Kresse in Support of Motion for

21  Summary Judgment, or in the Alternative, Partial Summary Judgment by Defendant Joan

22  Burtzel, Ex. C, pp. 145-55.  Moreover, at Huang's request, Scarff's bank statements were kept at

23  the Comerica office.  *See, e.g.*, Gregory Decl. A, Ex. E, pp. 40-42 and Ex. G, pp. 12, 26-27.

24  While the Court has considerable doubt that a jury in fact would conclude that Scarff was

25  reasonably diligent (given the fact that he apparently never looked at his own bank records), it is

26  not inconceivable that a reasonable jury could reach such a conclusion.  Thus, summary

27  adjudication that the discovery rule does not apply is inappropriate.

28        At oral argument, counsel for Comerica argued, as Comerica did in its moving papers,

7

that under *Kiernan v. Union Bank* "the employer, though not imputed with knowledge of the fraud of his faithless agent, is, as principal, chargeable with such information as an honest employee, unaware of the wrongdoing, would have acquired from the examination of the cancelled checks and bank statements." *Kiernan*, 55 Cal.App.3d 111, 117 (1976). However, because *Kiernan* involved the specific statutory duty of a customer to discover and report his unauthorized signature on forged instruments, it is distinguishable. *Id*. at 115 ("Section 4406 [of the Uniform Commercial Code] places a burden upon a bank customer to examine his statements regularly and discover any forgeries or alterations on any item included therein so long as the bank has met its duty of making available the statement of account and items paid to the customer.").

Accordingly, Comerica's motion for partial summary adjudication on the issue of damages will be DENIED.

## 2.  Intuit, CRI, Ciccotti, and Hvegholm

Defendants Intuit, CRI, and Ciccotti move for summary judgment on Scarff's, Pentoga's, and SSA's third claim for secondary liability for fraud and deceit and fourth claim for secondary liability for conversion. In addition or in the alternative, they request summary adjudication as to three issues: (1) whether claims that are based on an aiding and abetting theory are time-barred to the extent that the thefts occurred more than three years prior to Plaintiffs' filing, (2) whether Pentoga has capacity to bring claims in this action, and (3) whether Plaintiffs may pursue a claim for punitive damages against Intuit or CRI.[4]  Defendant Hvegholm also moves for summary judgment on Plaintiffs' third and fourth claims and joins in the motion of Intuit et al. Plaintiffs

---

[4] Defendants Wells Fargo and Barber join in the motion of Intuit et al. Because the Court will grant Intuit et al.'s motion on the ground that Plaintiffs have not met their burden of presenting specific evidence showing that there is a genuine issue for trial, it does not reach these three issues with respect to Intuit et al. However, as discussed below, the Court does reach the first and third issues with respect to Wells Fargo and Barber. Additionally, even though none of the claims alleged by Pentoga will remain after this disposition, the Court nevertheless provides reasoning supporting its conclusion, below, that Pentoga does not have standing to assert any claims.

8

1    filed opposition to both motions for summary judgment.[5]

2         **_a. Factual background regarding Intuit, CRI, Ciccotti, and Hvegholm_**

3         On October 6, 1983, Wells Fargo and Pentoga entered into a Business Services

4    Processing Agreement (the "Pentoga Payroll Agreement"), under which Wells Fargo contracted

5    to provide payroll processing services to Pentoga.  CAC, Ex. A.  On August 7, 1984, the Pentoga

6    Payroll Agreement was amended to designate Huang as the authorized contact person for

7    Pentoga.  *Id.*  On November 3, 1983, Wells Fargo and SSA entered into an identical agreement

8    (the "SSA Payroll Agreement").  CAC, Ex. B. On July 30, 1985, the SSA Payroll Agreement was

9    amended to designate Huang as a "contact and authorized signature."  *Id.*; Bass Decl., Ex. 5, pp.

10   55-59.  Both contracts include a "notification of errors" clause:

11         Upon Bank's delivery of output data to Customer, Customer shall have twenty-
           four (24) hours in which to examine all documents to verify accuracy.
12         Notification of missing or incorrect items may be made orally by Customer to
           Bank but shall on the same day be confirmed in writing to the address set forth in
13         Section I.  If no notification is given within this time period, subsequent requests
           for corrections will be considered Special Handling and will be subject to the
14         additional fees for such services.  Proof of processing and final audit
           responsibility remains with the Customer.

15   CAC, Exs. A and B.

16        In 1990, Wells Fargo outsourced its payroll processing agreements to CRI.  Declaration

17   of David Merenbach in support of Wells Fargo Bank N.A.'s, Carol Barber's, Intuit Inc.'s,

18   Computing Resources, Inc.'s and Lisa Ciccotti's Motions for Summary Judgment (hereinafter

19   "Merenbach Decl."), ¶¶ 3-4 and Ex. A, § 2.  In May 1999, Intuit acquired CRI as a wholly owned

20   subsidiary, thereby acquiring the Pentoga and SSA payroll processing contracts.  Merenbach

21   Decl., ¶ 5.  Hvegholm was employed by CRI from 1984 to 1996 in various payroll and customer

22   service-related positions.  Bass Decl., Ex. 17; Declaration of Susan Story in Support of Wells

---

[5] On November 23, 2005, Plaintiffs filed opposition to Hvegholm's motion for summary judgment.  On December 7, 2005, Plaintiffs submitted an almost identical opposition to Intuit et al.'s motion for summary judgment, despite the significant substantive differences between these motions for summary judgment, and failed to address many of the arguments made by Intuit et al.  Highlighting Plaintiffs' failure to distinguish substantively their two oppositions is the fact that they conclude their opposition to Intuit et al.'s motion with the sentence: "For the foregoing reasons, Hvegholm's Motion for Summary Judgment should be denied."

9

Fargo Bank N.a.'s, Carol Barber's, Intuit Inc.'S, Computing Resources, Inc.'S and Lisa Ciccotti's Motions for Summary Judgment (hereinafter "Story Decl."), ¶ 20.  In 1986, Ciccotti began her employment with CRI, where she held a series of payroll and tax-related positions.  Ciccotti Decl., ¶ 2.

The payroll processing services provided by CRI, and later Intuit, included "calling in payroll."  Declaration of Philip Gregory in Opposition to Hvegholm's Motion for Summary Judgment (hereinafter "Gregory Decl. B"), Ex. A, p. 44.  An authorized person would call in the amount of payroll to a designated CRI/Intuit representative.  Story Decl., ¶ 4.  CRI/Intuit would process the information overnight, and the checks would be sent out the following day.  Gregory Decl. B, Ex. A, p. 44.  In 1985, Hvegholm, then a payroll representative for CRI, began providing payroll services for Pentoga and SSA.  *Id*., pp. 31-32.  It was at this point that Hvegholm first had contact with Huang, who would call in the payroll for these companies.  *Id*. CRI had on file a "semimonthly salary rate" for Pentoga and SSA.  *Id*., p. 41.  The person calling in payroll, however, might request payroll amounts that deviated from the stated salary rates.  *Id*., pp. 41-42.  Hvegholm has testified that she understood Huang's title to be "Head Accountant," and that she knew that Huang was not an owner of Pentoga or SSA.  *Id*., pp. 43-44.  Hvegholm recalled that there was only one employee, Huang, on the payroll of Pentoga and there were five or six employees on the payroll of SSA (but by the 1990s, Huang was also the only employee on the payroll of SSA).  *Id*., pp. 51-52.

In 1985 or 1986, Huang contacted Hvegholm and said that Huang needed to adjust her salary.  Hvegholm has testified that Huang made the following explanation: "[the owners of her company] wanted to ensure that she got what was due to her each pay period, and that she would pay herself though Pentoga Partners and Scarff, Sears & Associates, and whenever they deemed she was receiving her pay or the money was coming in on these other companies, she would call in an adjustment on the two companies, on Scarff, Sears and Pentoga Partners, and pay the net— pay back to those two accounts that those—that the payroll was debited from."  *Id*., p. 53. Hvegholm never contacted Scarff about this arrangement.  *Id*.  However, Hvegholm did check with her supervisor, Susan Story ("Story"), who told Hvegholm that she could process payroll in

1   this manner.  *Id.*, p. 54.  Hvegholm has testified that she does not recall any other customer

2   having such an arrangement during her time at CRI.  *Id.*, p. 65.

3     Huang would say to Hvegholm, "'I need my year-to-date wages now to read this,'" and

4   Hvegholm would "give her a call back and let her know what the net pay was due back to the

5   company, and then she would deposit that amount back into the appropriate company's account."

6   *Id.*, p. 55.  The computer records would show that a check was voided in order to show the

7   adjustment, even though the check was not in fact voided.  *Id.*, pp. 55-56.  "For the most part,"

8   these adjustments were made every two weeks, though sometimes Huang would not make an

9   adjustment.  *Id.*, p. 58.  Later, Huang sent deposit receipts to Hvegholm documenting the amount

10  that had been put back into the Pentoga and SSA accounts.  *Id.*, p. 56.

11    Hvegholm and Huang met in person for the first time in 1986 or 1987, when Hvegholm

12  visited Huang in Berkeley, at Huang's invitation.  *Id.*, p. 69.  Hvegholm paid for her own flight,[6]

13  and Huang paid for Hvegholm's hotel room and a dinner cruise.  *Id.*, pp. 71 and 73.  Huang also

14  gave Hvegholm gifts of items and cash.  In 1985, Huang sent Hvegholm a check for $300, which

15  Hvegholm reported to Story and Harry Hart ("Hart"), one of the owners of the company.  *Id.*, p.

16  72.  They both told Hvegholm to return the check.  *Id.*  This was the only gift that Hvegholm

17  returned, and she never again reported to Story the gifts she received from Huang.  *Id.*, pp. 104

18  and 106.  Huang gave Hvegholm several purses as gifts.  *Id.*, p. 95.  Hvegholm has testified that

19  she received cash—which was "never compensation;" it was "always gifts because we were

20  friends, and they were given at Christmas, Thanksgiving, sometimes Easter"—every year starting

21  in the late 1980s.  *Id.*  She also testified that she might have received cash in other months.  *Id.*,

22  p. 96.  Hvegholm has testified that the checks ranged in amount from $300 to $1,700, explaining

23  that the larger check came at Christmas or the birth of a child.  *Id.*, p. 97.  Huang also asked

24  Hvegholm to give specified amounts of money to Ciccotti because Huang "didn't have time, you

25  know, to write out multiple checks."  *Id.*, p. 97.  Hvegholm has testified that she did not recall the

26

27

28    [6] In her deposition testimony, Hvegholm did not identify the origin of her flight to the Bay Area.  At the time, she was working for CRI in Reno, Nevada.  Gregory Decl. B, Ex. A, p. 11.

11

1    specific amounts she gave to Ciccotti. *Id*., p. 99.  In response to the suggestion that it ranged

2    from "a few hundred to several thousand at most," she responded, "At most, yes.  At way most."

3    *Id*.  On at least one occasion, as one of the first gifts, Huang sent a cashier's check in the amount

4    of three or four hundred dollars. *Id*., pp. 99-100.  Hvegholm explained that it was sent in

5    response to Hvegholm having returned a previous check—Huang sent the cashier's check and

6    said that Hvegholm had to cash it or Huang would be out the money. *Id*.

7        After Hvegholm left CRI in 1996, she continued calling in payroll for Carol Huang. *Id*.,

8    pp. 123-24.  She informed several people at CRI/Intuit, including Hart, Linda Stoddard, Ciccotti,

9    Iris Matthews, and Carol King, about this continued service. *Id*., p. 124.  Huang wrote  a letter

10   authorizing Hvegholm to call in payroll for her. *Id*., p. 127.  At this point, the checks that Huang

11   sent increased in value, ranging from about a thousand dollars to three or four thousand dollars.

12   *Id*., pp. 100-101.  During this time, Ciccotti did most of the calculations for Huang's payroll

13   adjustment. *Id*., p. 138.  In August 2002, when Huang left the country, she had the Intuit reports

14   send to Hvegholm's home.  Gregory Decl. B, Ex. C, pp. 157-58.

15           ***b. Damages arising from the payroll scheme***

16        Defendants Intuit, CRI, and Ciccotti argue that Plaintiffs cannot prove that they suffered

17   damages as a result of the alleged payroll scheme; Hvegholm joins in this argument.  Both of the

18   remaining claims against these Defendants—the third claim, for secondary liability for fraud and

19   deceit in connection with the alleged "payroll scheme" and the fourth claim for secondary

20   liability for conversion in connection with the alleged "payroll scheme"—require that Plaintiffs

21   show evidence of damages.  The elements of a claim for fraud and deceit are: (1) a

22   misrepresentation (i.e., false representation, concealment, or nondisclosure), (2) knowledge of

23   the falsity, (3) intent to defraud (i.e., to induce reliance), (4) justifiable reliance, and (5) resulting

24   damage.[7] *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996).  The elements of a claim for

25

26        [7] When a claim for fraud and deceit is based specifically on concealment, the elements of
27   the claim are as follows: "(1) the defendant must have concealed or suppressed a material fact,
     (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the
28   defendant must have intentionally concealed or suppressed the fact with the intent to defraud the

                                                   12

1   conversion are: "(1) plaintiffs' ownership or right to possession of the property at the time of the

2   conversion; (2) defendants' conversion by a wrongful act or disposition of plaintiffs' property

3   rights; and (3) damages." *Baldwin v. Marina City Properties, Inc.*, 79 Cal.App.3d 393, 410

4   (1978). "It is well settled [] that money on deposit with a bank may not be the subject of

5   conversion." *Lawrence v. Bank of America*, 163 Cal.App.3d 431, 437 (1985). "[M]oney cannot

6   be the subject of a conversion action unless a specific sum capable of identification is involved."

7   *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*, 49 Cal.App.4th 472, 485 (1996).

8   In *Software Design*, the money at issue could not be subject to a claim of conversion because "it

9   came into the partnership accounts over time, in various sums, without any indication that it was

10  held in trust for [the plaintiff]." *Id.*

11          Intuit et al. argue that the accounts of SSA, Pentoga, and Scarff were merely "used" in the

12  payroll scheme, and that Plaintiffs suffered no identifiable damages.  Plaintiffs allege in their

13  CAC that "Huang wrote checks on the Northcliff account at WFB and/or transferred from the

14  Northcliff account, the amount equal to the difference between her actual salary and the

15  fraudulent "overpayment," and that the money in the Northcliff account was transferred from the

16  Scarff personal checking account. CAC, ¶¶ 57, 58.  While Intuit et al. argue that the money in

17  Scarff's personal account was obtained fraudulently from financial institutions, Plaintiffs allege

18  that the credit line funds "together with Mr. Scarff's personal [Wells Fargo] deposits, and [Wells

19  Fargto] deposits associated with the income and/or earnings of SSA, Pentoga, and Northcliff (a

20  separate account), were used to 'fund' the SSA and Pentoga business accounts that were used for

21  payroll." *Id.*, ¶ 8.  However, as Intuit et al. argue, Plaintiffs have failed to identify any specific

22  evidence that their own funds were used in the payroll scheme; if such evidence exists, it

23  apparently is located at some unspecified location in the volumes of documents that have been

24  submitted to the Court.  Plaintiffs' opposition papers also fail to explain how, given the

25  _____

26  plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did

27  if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or
    suppression of the fact, the plaintiff must have sustained damage." *Marketing West, Inc. v.*

28  *Sanyo Fisher (USA) Corp.*, 6 Cal.App.4th 603, 612-13 (1992).

13

1   complicated nature of the scheme, any such evidence fits together.

2          Huang has testified that it was her "best recollection" that, in the words of Plaintiffs'

3   attorney, "no money belonging to Mr. Scarff from his income or earnings or businesses [] went to

4   fund [Huang's] payroll adjustments other than the lines of credit."  Bass Decl., Ex. 10, p. 514.  In

5   the Santa Clara Superior Court action regarding the same factual allegations that underlie the

6   instant action, Plaintiffs submitted an expert declaration by Brian M. Kreischer ("Kreischer")

7   regarding damages.  *Id.*, Ex. 32.  Kreischer's  analysis covers only the period from November

8   1996, the inception of the Wells Fargo credit line, through September 2002.  *Id.*, ¶ 7.  He states:

9   "Due to the fungible nature of cash, I did not attempt to trace specific deposits from the

10   Comerica credit facilities to these fraudulent payments.  However, it is clear these Comerica

11   credit facilities were a major funding source for Huang's payroll fraud scheme."  *Id.*, Ex. 32 ¶ 8.

12          Intuit et al. argue that there is also no competent evidence of damages to Scarff, SSA, or

13   Pentoga prior to January 1997.  Scarff was asked by interrogatory to "[i]dentify each transfer of

14   'funds from Edward Scarff's personal accounts at Wells Fargo through Northcliff Corporation's

15   account at Wells Fargo' that 'reimburse[ed] the SSA and Pentoga payroll accounts,'" as alleged

16   in the CAC.  Bass Decl., Ex. 23, p. 14.  In response, Scarff identified only deposit amounts

17   beginning on January 7, 1997.  *Id.*, pp. 15-17.  SSA was asked by interrogatory to identify its

18   own funds, if there were any, that were embezzled through the payroll  scheme.  *Id.*, Ex. 27, p.

19   24.  In response, SSA identified only deposit amounts on or after January 2, 1997.  *Id.* pp. 25-34.

20   Pentoga, in response to the same interrogatory, did identify Pentoga dividend and interest income

21   prior to 1997.  *Id.*, Ex. 25, p. 17.  However, Intuit et al. make a reasonable argument that there is

22   no identifiable competent evidence that this income funded the payroll scheme.  Pentoga does

23   identify the Wells Fargo bank account # 4001-166917 as the account from which funds were

24   embezzled.  *Id.*  However, Plaintiffs do not identify any specific competent evidence that

25   supports the conclusion that the income identified prior to 1997 was deposited into this account.

26   The only documentary evidence that cited by Pentoga are Schedule K tax returns, which, as Intuit

27   et al. argue, are unlikely to show deposits made to any particular bank account.  It is entirely

28   possible that these funds were not deposited into Wells Fargo bank account # 4001-166917, as

14

1    Pentoga appears to have had more than one bank account.  *See* Bass Decl., Ex. 16, p. 135.

2          Thus, it is not readily apparent that any competent evidence exists that demonstrates that

3    any of Plaintiffs' own funds were embezzled through the alleged payroll scheme.  Intuit et al.

4    have met their burden on summary judgment of showing "'that there is an absence of evidence to

5    support the nonmoving party's case.'"  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)

6    (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)); *see also*, *Fairbank v. Wunderman*

7    *Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000) ("Under the federal standard a moving

8    defendant may shift the burden of producing evidence to the nonmoving plaintiff merely by

9    'showing'—that is, pointing out through argument—the absence of evidence to support plaintiff's

10   claim.").  Because Intuit et al. have met their initial burden, Plaintiffs may not rest upon mere

11   allegations or denials, but must present evidence sufficient to demonstrate that there is a genuine

12   issue for trial.  *Id*.

13          Plaintiffs have not met their burden of presenting specific evidence showing that there is

14   a genuine issue for trial.  In fact, they offer *no response* in opposition to the argument that there

15   is no evidence of damages.  At oral argument, the Court inquired as to whether there was specific

16   evidence showing that any of the Plaintiffs had been damaged.  In response, Plaintiffs' counsel

17   indicated that such evidence is in "the answers to interrogatories."  This response confirmed the

18   Court's initial conclusion that Plaintiffs had not met their burden of "[setting] forth in the

19   opposing papers with adequate references [evidence establishing a genuine issue of fact] so that

20   it [can] conveniently be found."  *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th

21   Cir. 2001).  It is not the Court's task to "'scour the record in search of a genuine issue of triable

22   fact.'"  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).[8]

23          Accordingly, the motions of Intuit, CRI, Ciccotti, and Hvegholm on Plaintiffs' third and

24

25          [8] A court may, in its discretion, choose to delve deeply into the record for evidence
26   supporting a party's position.  However, when the evidence is so complicated and vastly
     scattered throughout the record, and a party with sufficient legal resources has failed entirely to
27   address the argument of the opposing party or identify with specificity any evidence, it is
     unreasonable for that party to expect, or even to hope, that a Court would scour the record in
28   search of evidence supporting its position.

                                                    15

1   fourth claims will be GRANTED.  As a result of this ruling, no claims remain against these

2   Defendants.[9]

3       **c. Respondeat superior liability**

4       An independent, alternative ground on which the Court grants Intuit's and CRI's motion

5   for summary judgment is that the doctrine of respondeat superior does not make Intuit or CRI

6   vicariously liable for the alleged actions of Hvegholm or Ciccotti, because these individuals,

7   assuming that they engaged in the alleged illegal conduct, acted outside the scope of their

8   employment.  Plaintiffs offered no response to this argument in their opposition to Intuit et al.'s

9   motion for summary judgment.

10      Under California law, the doctrine of respondeat superior makes an employer "vicariously

11  liable for the torts of its employees committed within the scope of the employment." *Lisa M. v.*

12  *Henry Mayo Newhall Mem'l Hosp.*, 12 Cal.4th 291, 296 (1995).  An employee's tort is within

13  the scope of her employment if "the risk of such an act is typical of or broadly incidental to the

14  employer's enterprise." *Yamaguchi v. Harnsmut*, 106 Cal.App.4th 472, 482 (2003).  The

15  employee's motive is relevant to the determination of whether respondeat superior liability

16  arises: "An act serving only the employee's personal interest is less likely to arise from or be

17  engendered by the employment than an act that, even if misguided, was intended to serve the

18  employer in some way." *Lisa M.*, 12 Cal.4th at 298.  It is not enough that "the employment

19  brought tortfeasor and victim together in time and place."  *Id*.  Rather, " the incident leading to

20  injury must be an 'outgrowth' of the employment," or "the risk of tortious injury must be

21  'inherent in the working environment'" or "typical of or broadly incidental to the enterprise [the

22  employer] has undertaken."  *Id*.  Vicarious employer liability may arise if the employee's tort was

23  foreseeable, meaning "that in the context of the particular enterprise an employee's conduct is

24  not so unusual or startling that it would seem unfair to include the loss resulting from it among

25

26      [9] The Court can conceive of an argument that Scarff was damaged by the payroll scheme
    to the extent that he paid fees and interest on the loans obtained through the credit line scheme
27  and used to fund the payroll scheme.  However, Plaintiffs did not plead this theory in the CAC or
    raise this argument in their voluminous briefing, and the Court declines to consider this argument
28  *sua sponte*.

16

1   other costs of the employer's business." *Id*.

2   Following California law, the Ninth Circuit has held that an employer was not liable for

3   an employee's theft, even though it was made possible by his ability to access a "'secure' holding

4   area by way of his employment," because it "would be hard-pressed to find that the employee's

5   thievery served [the employer's] interests in any way.  The theft exposed [the employer] to

6   liability under the Warsaw Convention, potential loss of business, damage to its reputation, legal

7   fees, and other harms that normally arise from employee theft." *Insurance Co. of North America*

8   *v. Federal Exp. Corp.*, 189 F.3d 914, 922 (9th Cir. 1999).  Similarly, assuming *arguendo* that

9   Hvegholm and Ciccotti did conspire with or aid and abet Huang in the alleged payroll scheme,

10  the actions of these employees would not give rise to the vicarious liability of Intuit or CRI.

11  Participation in a fraudulent scheme, such as the one alleged, though made possible by

12  Hvegholm's and Ciccotti's employment, would not serve the interests of Intuit or CRI in any

13  way.  Moreover, such conduct would be "so unusual or startling" that it would be unfair to hold

14  these employer's liable.  *Lisa M.*, 12 Cal.4th at 298.

15

16  **3.    Wells Fargo and Barber**

17  Wells Fargo and Barber move for summary judgment on Scarff's, Pentoga's, and SSA's

18  third claim, for secondary liability for fraud and deceit in connection with the alleged "payroll

19  scheme" and fourth claim for secondary liability for conversion.  Wells Fargo and Barber also

20  move for summary judgment on Scarff's ninth claim for secondary liability for fraud and deceit

21  in connection with the alleged "credit line scheme."  Wells Fargo moves for summary judgment

22  on Scarff's eleventh claim for negligence in connection with the alleged "credit line scheme."

23  Barber moves for summary judgment on Scarff's, Pentoga's, and SSA's sixth claim for violation

24  of 12 U.S.C. § 503 and 18 U.S.C. § 215 in connection with the alleged "payroll scheme" and on

25  Scarff's twelfth claim for violation of these same statutes in connection with the alleged "credit

26  line scheme."  Wells Fargo moves for summary judgment on Scarff's and Nancy Scarff's

27  fourteenth claim for slander of title.  Finally, Wells Fargo and Barber join in the motion of Intuit

28  et al.

1

    ***a. Factual background regarding Wells Fargo and Barber***

2    Richard Starratt ("Starratt"), a vice president in Wells Fargo's private banking

3 department, was Scarff's private banker at Wells Fargo.  Declaration of Philip L. Gregory in

4 Opposition to the Motion for Summary Judgment of Defendants Wells Fargo Bank N.a., Carol

5 Barber, Intuit Inc., Computing Resources, Inc. and Lisa Ciccotti (hereinafter "Gregory Decl. C"),

6 Ex. B, pp. 18, 31-32.  Starratt provided the following description of Scarff's relationship with

7 Wells Fargo in or about 1991, when Starratt was first introduced to Scarff:

8
9
10

> [H]e had several checking accounts, I think he had a line of credit that had been
> lapsed and I know that he had introduced to the bank an investment in one of his
> quote deals unquote, on which Wells Fargo made an awful lot of money.  I think
> he was a personal friend of then CEO Carl Reichardt and I know he was highly
> regarded by senior management of the bank.

11 *Id*., pp. 31-32.  During the period from 1997 through April 2002, Ed McElroy ("McElroy"), vice

12 president and manager of private banking at Wells Fargo, was Starratt's direct supervisor.

13 Gregory Decl. C, Ex. A, pp. 46 and 56.  Barber worked for Wells Fargo from 1996 until 2003,

14 working as a private banking account administrator from 1988 to October 1991, and

15 subsequently at a telephone service center that was established for the private banking customers.

16  Declaration of Carol Barber in support of Wells Fargo Bank N.A.'s, Carol Barber's, Intuit Inc.'s,

17 Computing Resources, Inc.'s and Lisa Ciccotti's Motions for Summary Judgment (hereinafter

18 "Barber Decl."), ¶¶ 2-4.

19    Between 1991 and 2002, Wells Fargo extended a number of loans to Scarff, or, as Scarff

20 characterizes the situation, to Huang in Scarff's name.  Plaintiffs and Defendants have referred to

21 the numerous Wells Fargo loan transactions throughout their pleadings; witnesses have discussed

22 them in depositions; and both parties have submitted documents relating to and representing

23 these transactions.[10]  However, no party has presented a cohesive and coherent explanation, with

24

25    [10] Many of the relevant documents have not been authenticated.  For example, in their

26 opposition brief, Plaintiffs routinely cite to documents that are attached to the declaration of
David S. Moore ("Moore").  Because he is a forensic examiner whose testimony is submitted for

27 the purpose of identifying which of Scarff's signatures are forgeries, Moore obviously is not in a
position to authenticate the Wells Fargo loan documents.  Many of the same documents are also

28 attached to Plaintiffs' CAC, but without authentication.  However, neither Plaintiffs nor

1    particular citations to admissible evidence, of the precise timeline of all Wells Fargo loans, loan

2    extensions, and other transactions related to Huang's alleged scheme.  For the purpose of the

3    instant motion for summary judgment, a discussion of several significant transactions must

4    suffice.

5              In approximately 1991, at Starratt's suggestion, Scarff established a $1,000,000 line of

6    credit with Wells Fargo.  Declaration of Edward L. Scarff in Opposition to the Motion for

7    Summary Judgment of Defendants Wells Fargo Bank N.A., Carol Barber, Intuit Inc., Computing

8    Resources, Inc. and Lisa Ciccotti (hereinafter "Scarff Decl."), ¶ 11.  In 1999, Wells Fargo

9    established a non-revolving line of credit for $2,500,000 in Scarff's name.  Starratt Decl., ¶ 7.

10   Scarff claims that this credit line was established without his knowledge or his valid signature.

11   Scarff Decl., ¶ 12.  Starratt explains that he "was informed by Ms. Huang that Mr. Scarff wanted

12   this new line of credit in connection with a house he was building in the Lake Tahoe area."

13   Starratt Decl., ¶ 7.  Starratt's communication regarding Scarff's account was conducted most

14   frequently with Huang.  Gregory Decl. C., Ex. B, pp. 129-30.  In August 2001, Starratt had a

15   meeting with Huang in which she informed him that, although there was $1,000,000 due at that

16   time on one or more of the Scarff loans, Scarff only would be able to pay $500,000.  *Id.*, pp. 167-

17   68.  Starratt does not recall communicating directly with Scarff regarding this partial payment.

18   *Id.*, p. 168.  Between 2000 and 2002, Starratt provided extensions of credit to Scarff.  *Id.*, pp.

19   190-91.  Starratt's bonus compensation was affected by the amount of business, including

20   establishing loans, that he brought to the bank.  Gregory Decl. C., Ex. B, p. 30.

21             Starratt stated that he was informed by Huang in 2001 "that the Tahoe project was taking

22   longer than anticipated and that Mr. Scarff wanted to extend the term of the loan."  Starratt Decl.,

23   ¶ 8.  Starratt requested security for the loan, and he gave documentation to Huang for the

24   recording of a trust on Scarff's residence in Los Altos.  *Id.*  Huang has testified that she—not

25   Scarff—signed the deed of trust, and that she arranged for a notary to notarize the deed.  *Id.*, pp.

26   439-40.  During this period, McElroy had taken over the Scarff account, and it was he who

27

28   Defendants have challenged the authenticity of the submitted Wells Fargo loan documents.

1    received the completed loan documents and deed of trust from Huang.  McElroy Decl., ¶¶ 3 and

2    4.  Plaintiffs point to several irregularities in the deed of trust.  For example, the deed initially

3    misstated the location of the residence as San Francisco rather than Santa Clara County.  CAC, ¶

4    88; Declaration of Jo Ann Hernandez in Support of Wells Fargo Bank N.A.'s, Carol Barber's,

5    Intuit Inc.'s, Computing Resources, Inc.'s and Lisa Ciccotti's Motions for Summary Judgment, ¶

6    5.  Jo Ann Hernandez, a loan processor for Wells Fargo, explained that this error was corrected

7    by a Wells Fargo employee and returned to Fidelity Trust for recordation.  *Id.*, ¶ 7.  Scarff also

8    claims that the spelling of the notary's signature is different from that on the notary's official

9    stamp.  CAC, ¶ 89.  According to McElroy, "The signed loan documents and notarized deed of

10   trust appeared to [him] to be genuine and in order. [He] noticed nothing suspicious about Mr.

11   Scarff's signature or the notary stamp."  McElroy Decl., ¶ 4.

12        In addition to having lines of credit with Wells Fargo, Scarff also had deposit accounts

13   with the bank.  Declaration of Rose Pagano in Support of Wells Fargo Bank N.a.'s, Carol

14   Barber's, Intuit Inc.'S, Computing Resources, Inc.'S and Lisa Ciccotti's Motions for Summary

15   Judgment (hereinafter "Pagano Decl."), ¶ 3, Ex. A (account in the name of Edward Scarff), Ex. B

16   (account in the name of Pentoga Partners), Ex. C (account in the name of Scarff, Sears &

17   Associates), and Ex. D (account in the name of Northcliff Corporation).  Huang had authority to

18   write checks on Scarff's Wells Fargo checking accounts because, at some point, Scarff enabled

19   her to do so with a signature card.  Bass Decl., Ex. 1, p. 137.  Scarff has testified that he

20   "expected [Huang] to review the bank statements."  *Id.*, p. 185.  Huang co-signed, with Scarff,

21   the Account Agreement and Authorization forms for the accounts of Pentoga and Northcliff.

22   Pagano Decl., ¶ 3, Exs. B and D.  She had authority to transfer funds among Scarff's accounts,

23   including those of Pentoga and SSA.  *Id.*, ¶ 3 and Ex. G.  Wells Fargo also had loan documents

24   on file that "authorized Carol Huang to make draw-downs on [Scarff's] credit facilities."

25   Gregory Decl. C, Ex. A, p. 249.  However, McElroy has testified that he knew of no written

26   authorization for Huang to request new loans on behalf of Scarff.  *Id.*, pp. 46 and 249.  McElroy

27   also was unaware of any documents that allowed Huang to draw down on the $2.5 million or

28   $2.0 million lines of credit.  *Id.*, p. 254.  Scarff himself never contacted Wells Fargo to inquire

20

1  about his account or accessed online account reports, available beginning in 1995.  Bass Decl.

2  Ex. 4, p. 484; Pagano Decl. ¶ 10.  It is undisputed that the Wells Fargo bank account statements

3  of SSA showed evidence of the payroll scheme, which Scarff has acknowledged would have

4  indicated to him that something was amiss.  Bass Decl., Ex. 5, pp. 90-91.

5      Huang has testified that she funded the alleged payroll scheme, as described above, from

6  Scarff's various Wells Fargo accounts.  Bass Decl., Ex. 9, pp. 364-68.  Barber, who worked on

7  Scarff's account, received verbal requests from Huang to transfer funds from one account to

8  another, and processed these requests without getting authorization from Scarff.  *Id*; Gregory

9  Decl. C, Ex. C, p. 130.  When Huang requested advances on Scarff's credit line, Barber "caused

10  the funds to be deposited into Mr. Scarff's account."  Barber Decl., ¶ 5.  Barber communicated

11  with Huang regularly and provided her with the account balances of each account on a daily or

12  every-other-day basis.  Gregory Decl. C, Ex. C, p. 97.  Although Barber worked on Scarff's

13  account, she never communicated with Scarff regarding any business transaction.  Gregory Decl.

14  C, Ex. C, p. 54.  She met him only once, at the wedding of Huang's daughter.  *Id*., p. 55.

15      Barber's services for Huang and the Scarff account clearly were out of the ordinary.  For

16  example, Barber prepared and faxed to Huang numerous letters regarding the status of Scarff's

17  deposit accounts, dating from 1996 through 2001, addressed "To Whom It May Concern."  *Id*.,

18  pp. 107-108 and Exs. 7-15.  The letters were very similar in content; one such letter reads "This

19  letter is to confirm that Edward L. Scarff has liquid funds at Wells Fargo Bank in excess of One

20  Million Dollars."  *Id*., Ex. 7 (letter dated May 10, 1996).  At Huang's request, Barber arranged

21  for Scarff's statements to be kept at the bank.  *Id*., pp. 184-85.  Barber has testified that Huang

22  explained that this was necessary "because she was suspicious that some of her statements were

23  missing" and because their offices were moving.  *Id*., pp. 185-86.  A letter dated October 30,

24  1998, addressed to Barber and bearing what appeared to be Scarff's signature, requests: "please

25  hold all my monthly statements, personal or/and business, at your office for pick up.  Carol

26  Huang is authorized to discuss all details and procedures on my behalf and to pick up at your

27  office."  *Id.*, Ex. 30.

28      Barber received numerous gifts of items and cash from Huang.  Among these were black

21

1   leather gloves, a red, white, and blue scarf, a white embroidered scarf, a burgundy and black

2   embroidered scarf, a black/floral scarf, cupid-shaped earrings, a red and black leather purse, a

3   black leather purse, a white leather purse, a tan Gucci purse, a gold lapel pin in the shape of a

4   wine bottle, a Tse sweater set, a shawl with gloves, a suitcase, an orchid plant, a camellia plant, a

5   pearl bracelet, a Kate Spade tote bag, a red Macintosh rain coat, an Easter gift box, a box of

6   Christmas ornaments, a security device, a ticket to a charity event for Open Hand in Napa Valley,

7   various floral bouquets, a souvenir charm with Defendant's name on it, a small silver souvenir

8   dish from New Mexico, a wire crocheted purse, a souvenir necklace, a set of miniature perfumes,

9   a gift certificate for round-trip airfare to Morocco,[11] and a heart-shaped ceramic dish.  *Id.*, Ex. 1

10  (Barber's response to Plaintiffs' first set of special interrogatories; Response to interrogatory no.

11  1).  She also received cash gifts, $300 (sometime prior to 1991); $100 in 1998; $100-200 in

12  February 1999; a check payable to Barber's niece in the approximate amount of $500 in July

13  1996; a cashier's check in the approximate amount of $1,200-1,500 in December 1996; $300 in

14  March 1998; $300 in November 1999, $800 in December 1999; $1,000 in December 2000; and

15  $2,000 on or about August 3, 2002.  *Id.*  Barber has testified that she was aware that Wells Fargo

16  placed limitations on the value of gifts that she could receive from customers.  *Id.*, pp. 59-60,

17  128-30.  She also testified, "If you received a gift from a customer based on a business

18  relationship, you would report it to your supervisor.  My gifts were not from the customer.  My

19  gifts were from a friend."  *Id.*, p. 60.

20      ***b. Claims three and four***

21          For the reasons stated above with respect to the motions for summary judgment brought

22  by Intuit et al. and Hvegholm, Wells Fargo's and Barber's motion for summary judgment on

23  Plaintiffs' third claim for secondary liability for fraud and deceit in connection with the "payroll

24  scheme" and fourth claim for secondary liability for conversion in connection with the "payroll

25  scheme," will be GRANTED on the ground that Plaintiffs have not met their burden of

26

27          [11] Barber has testified that she told Huang that she would not use this travel certificate and

28  that she did not, in fact, use it.  Gregory Decl. C, Ex. C., p. 77.

22

1  identifying specific evidence showing that there is a genuine issue for trial regarding damages to

2  Plaintiffs arising from the alleged payroll scheme.[12]

3       *c. Claim six*

4       Barber's motion for summary judgment on Plaintiffs' sixth claim for violation of 12

5  U.S.C. § 503 and 18 U.S.C. § 215 in connection with the alleged "payroll scheme," will be

6  GRANTED.  As stated above, Plaintiffs have not met their burden of identifying specific

7  evidence showing that there is a genuine issue for trial regarding damages to Plaintiffs arising

8  from the alleged payroll scheme.

9       *d. Claim nine*

10       Wells Fargo and Barber move for summary judgment as to Scarff's ninth claim for relief,

11  in which Scarff alleges that they are secondarily liable for fraud and deceit in connection with the

12  alleged "credit line scheme."  Scarff alleges that Wells Fargo and Barber conspired with and/or

13  aided and abetted Huang in her scheme.  The doctrines of conspiracy and aiding and abetting

14  both serve to impose secondary liability on a person who was not herself the tortfeasor.

15       The elements of an "action" for civil conspiracy—which is not a claim in itself but rather

16  is "a legal doctrine that imposes liability on persons who, although not actually committing a tort

17  themselves, share with the immediate tortfeasors a common plan or design in its perpetration"—

18  are "the formation and operation of the conspiracy and damage resulting to plaintiff from an act

19  or acts done in furtherance of the common design." *Applied Equip. Corp. v. Litton Saudi Arabia*

20  *Ltd.*, 7 Cal.4th 503, 511 (1994) (internal quotation marks omitted).  Tort liability for a civil

21  conspiracy is activated by the commission of an actual tort.  *Id*.  A plaintiff is entitled to damages

22  from "those defendants who concurred in the tortious scheme with knowledge of its unlawful

23  purpose," and that concurrence and knowledge "may be inferred from the nature of the acts done,

24  the relation of the parties, the interests of the alleged conspirators, and other circumstances."

25  *Wyatt v. Union Mortgage Co.*, 7 Cal.4th 503, 511 (1979).  Since conspiracy is not an independent

26  tort, it "cannot create a duty or abrogate an immunity," and it "allows tort recovery only against a

27

28      [12] *See supra* note 9.

Case No. C 03-03394 JF (PVT) and C 03-04829 JF (PVT)
ORDER RE MOTIONS HEARD ON JANUARY 6, 2006
(JFLC1)

1  party who already owes the duty and is not immune from liability based on applicable substantive

2  tort law principles." *Applied Equip.*, 7 Cal.4th at 513.

3      Liability for aiding and abetting the commission of an intentional tort is a basis for

4  liability separate from conspiracy liability. *See e.g.*, *Neilson v. Union Bank of California, N.A.*,

5  290 F. Supp. 2d 1101, 1133-36 (C.D. Cal. 2003).  It may be imposed if a person, knowing that

6  another person's conduct constitutes a breach of duty, "gives substantial assistance or

7  encouragement to the other to so act." *Saunders v. Superior Court*, 27 Cal.App.4th 832, 846

8  (1994).  In order to be held liable for aiding and abetting, an aider and abettor must have "actual

9  knowledge of the primary violation." *Neilson*, 290 F. Supp. 2d at 1119.

10      Wells Fargo and Barber move for summary judgment with respect to both conspiracy and

11  aiding and abetting liability on the ground that there is no evidence that they had actual

12  knowledge of Huang's scheme.  The Court agrees that there is no direct evidence of actual

13  knowledge.  However, although it is a close question, the Court concludes that Scarff has

14  presented enough circumstantial evidence to survive summary judgment.

15      Wells Fargo and Barber rely on statements by Huang and Barber as evidence that Barber

16  did not have knowledge of Huang's scheme.  Bass Decl., Ex. 8, pp. 270-71; Barber Decl., ¶ 10

17  ("I never suspected that Ms. Huang was conducting herself other than in accordance with Mr.

18  Scarff's wishes.").  However, a reasonable jury could conclude that Huang and Barber are not

19  being truthful in their statements, and, based on the available evidence, reasonably could infer

20  that Barber did in fact have such knowledge.  The Court finds three categories of evidence

21  particularly troubling.  First, as set forth above, Barber received relatively large sums of money

22  and an unusually high number of expensive gifts from Huang.  Second, Barber arranged to have

23  Scarff's bank statements kept at the bank.  Gregory Decl. C, Ex. C., pp. 184-85.  Barber has

24  testified that the request to keep the Scarff analysis statements at the bank, such that no statement

25  was sent to the customer directly, was the only such request she received while at Wells Fargo.

26  *Id*., p. 205.  Third, Barber prepared and faxed to Huang numerous letters regarding the status of

27  Scarff's deposit accounts, dating from 1996 through 2001, addressed "To Whom It May

28  Concern."  *Id*., pp. 107-108 and Exs. 7-15.  Considering these unusual circumstances together,

24

and keeping in mind Defendants' heavy burden on summary judgment, the Court concludes that a reasonable jury could infer actual knowledge.

Wells Fargo and Barber also point out that Scarff's response to Wells Fargo's eleventh interrogatory, which asks him to state the knowledge that he contends each previously named individual had concerning the credit line scheme, includes the following statement: "Plaintiff contends that Ms. Barber had *constructive knowledge* that Carol Huang was taking funds from Plaintiff without authorization." Bass Decl., Ex. 22, p. 29 (emphasis added). The Court agrees with Wells Fargo and Barber that constructive knowledge is insufficient to establish the intentional tort of fraud. However, Plaintiffs' inartful use of the term "constructive knowledge" does not change the probative value of the evidence in the record that supports an inference of actual knowledge.

Wells Fargo and Barber also argue that there is no evidence of concealment, pointing out that it was the bank's practice to send monthly statements to customers and that at all relevant times statements were available telephonically and electronically. Pagano Decl., ¶¶ 7-12. Although Barber, at Huang's direction, arranged to keep Scarff's statements at the bank, Gregory Decl. C, Ex. C., pp. 184-85, Wells Fargo and Barber argue that this fact is immaterial because Scarff delegated the task of looking at bank statements to Huang, and, thus, it was Scarff's choice not to look at the statements. However, while Scarff *could have* discovered the fraud by obtaining the statements himself, either physically or electronically, that does not negate the evidence suggesting that Barber may have assisted in concealing them knowing that Scarff had entrusted management of his financial affairs to Huang.

Accordingly, Barber's and Wells Fargo's motions for summary judgment on the ninth claim will be DENIED. Although in the Court's opinion the evidence for such an inference is not strong, a reasonable jury could infer that Barber, Wells Fargo's agent, had actual knowledge of Huang's scheme.

### d. Claim eleven

Wells Fargo moves for summary judgment as to Scarff's eleventh claim for relief, in

25

1   which Scarff alleges that Wells Fargo is liable for negligence in connection with the alleged

2   "credit line scheme."   Wells Fargo argues that Scarff's account agreements bar the negligence

3   claim.  A provision of Scarff's account agreement with Wells Fargo obligates the client, Scarff,

4   "To Review Statements And Items And To Report Irregularities."  Pagano Decl. Ex. F, p. 13.

5   This contractual provision reads as follows:

> Within 30 days after the Bank mails or otherwise makes the statement available to you, you will report to the Bank any claim for credit or refund due for example (and without limitation) to either an erroneous debit, a missing signature, an unauthorized signature, or an alteration. . . . *Without regard to care or lack of care on the part of the Bank*, if you don't notify the Bank within the time frames specified above, the stated balance will be conclusively presumed to be correct regarding debits described on the statement.  This means that the Bank is *released from all liability* for the Items charged to your account, and for all other transactions or matters covered by the statement.

11  *Id.*, p. 53 (emphasis added).  A second provision obligates the client "To Report Unauthorized

12  And Erroneous Fund Transfers."  *Id.*  Specifically, the client must "notify the Bank of the facts

13  within a reasonable time not exceeding thirty (30) days after" receiving notice of the transfer or

14  the account is debited.  If the client does not object within the thirty day period, the client "will

15  be precluding from asserting that the Bank is not entitled to retain payment."  *Id.*, p. 53.

16       While the terms of the contract cannot shield Wells Fargo from liability for fraud, they

17  appear on their face to preclude a claim based on negligence.  More importantly, Scarff has

18  provided no legal or factual argument in opposition to this aspect of Wells Fargo's motion.[13]

19  Accordingly, the Court will GRANT Wells Fargo's motion for summary judgment on the

20  eleventh claim.[14]

21

22       [13] While in a separate order the Court denies Plaintiffs' motion for reconsideration, it is
    worth noting here that Plaintiffs also fail to offer opposition to this claim in their motion for
23  reconsideration.

24       [14] The Court notes that it is not entirely clear whether the provisions precluding
25  negligence liability were included in the terms of Scarff's Wells Fargo account agreement prior
    to 2000.  The submitted Consumer Disclosure Statement "contains the terms of the Bank's
26  agreement from August 2000 through April 2001."  Pagano Decl., ¶ 5.  The relevant provisions
    were not modified when certain other provisions were modified in 2001.  *Id.*  However, no
27  representation, by either Scarff or Wells Fargo, has been made regarding whether substantively
    similar provisions were included in the account agreement prior to 2000.  Because Scarff has not
28  offered any evidence or argument to the contrary, either in opposition or in Plaintiffs' motion to

26

1

*e. Claim twelve*

2       Barber moves for summary judgment as to Scarff's twelfth claim, in which Scarff alleges

3  liability pursuant to 12 U.S.C. § 503 and 18 U.S.C. § 215 in connection with the alleged "credit

4  line scheme."  Under § 215, it is a crime if "an officer, director, employee, agent, or attorney of a

5  financial institution, corruptly solicits or demands for the benefit of any person, or corruptly

6  accepts or agrees to accept, anything of value from any person, intending to be influenced or

7  rewarded in connection with any business or transaction of such institution."  18 U.S.C. § 215(2).

8  Section 503 creates individual liability for a director or officer who *knowingly* violates 18 U.S.C.

9  § 215, or one of several other banking statutes.  *See* 12 U.S.C. § 503.  Barber's motion for

10  summary judgment on Plaintiffs' sixth claim, for violation of 12 U.S.C. § 503 and 18 U.S.C. §

11  215 will be denied.

12       Barber argues that there is no evidence of a correlation between the gifts she received

13  from Huang and the actions she performed with respect to Scarff's accounts.  She stated that she

14  believed that Huang gave her gifts out of friendship, and that the gifts did not influence her

15  decisions as a banking assistant.  Barber Decl., ¶¶ 13 and 14.  Huang has testified that Barber

16  also gave her gifts.  However, these gifts were of considerably less value: "Little stuffed animals,

17  candies, things like that."  Bass Decl., Ex. 9, p. 415.  This evidence, of a purported belief that

18  friendship was the only thing motivating Huang's gifts and of small gifts given in return, does

19  not prove that there was no corrupt correlation between Huang's gifts to Barber and Barber's

20  actions.  Barber also argues that because Huang was an authorized signer on Scarff's accounts,

21  Barber's assistance was not necessary for Huang to withdraw or transfer funds.  Pagano Decl., ¶

22  3,  Exs. B and D.  However, as stated above, Barber's actions included more than assisting with

23  the withdrawal and transfer of funds: Barber also arranged to have Scarff's statements kept at the

24  bank, wrote letters stating Scarff's account balance, and did not alert Scarff of Huang's frequent

25  banking transactions.  Although in the Court's judgment the evidence for such an inference is not

26

27  reconsider, the Court interprets the provisions in the submitted Consumer Disclosure Statement
   to be representative of substantively similar provisions that were applicable to Scarff's account
28  for the entirety of the relevant period.

27

1  strong, Plaintiff has identified sufficient evidence from which a reasonable jury a reasonable jury

2  could infer that the gifts were given and accepted with a corrupt intent.

3        Barber also argues that there is no evidence that she had knowledge of Huang's scheme.

4  For the reasons stated above with regard to the Scarff's ninth claim, the Court finds that a

5  reasonable jury could infer from the evidence in the record that Barber had actual knowledge of

6  and participation in the alleged "credit line scheme."  Accordingly, the Court will DENY

7  Barber's motion for summary judgment on the twelfth claim.

8       *f. Claim fourteen*

9        Wells Fargo moves for summary judgment on Scarff and Nancy Scarff's fourteenth claim

10 for slander of title.   In *Gudger v. Manton*, the California Supreme Court adopted the definition

11 of the tort of slander of title from Section 624 of the Restatement of Torts:

12     "One who, without a privilege to do so, publishes matter which is untrue and
       disparaging to another's property in land . . . under such circumstances as would

13     lead a reasonable man to foresee that the conduct of a third person as purchaser or
       lessee thereof might be determined thereby is liable for pecuniary loss resulting to

14     the other from the impairment of vendibility thus caused."

15 *Gudger v. Manton*, 21 Cal.2d 537, 541 (1943) (quoting section 624 of the Restatement of Torts),

16 *overruled on other grounds by Albertson v. Raboff*, 46 Cal.2d 375 (1956).  Sections 623A, 624,

17 and 633 of the Second Restatement of Torts subsequently have been held to:

18     further refine the definition so it is clear . . . that there must be (a) a publication,
       (b), which is without privilege or justification and thus with malice, express or

19     implied, and (c) is false, either knowingly so or made without regard to its
       truthfulness, and (d) causes direct and immediate pecuniary loss.

20

21 *Howard v. Schaniel*, 113 Cal.App.3d 256, 264 (1980) (internal citations omitted).

22      The Court concludes that Plaintiffs have not identified sufficient evidence from which a

23 reasonable jury could conclude that Wells Fargo recorded the deed of trust on the Scarff

24 residence with knowledge of falsity or disregard of the truth.  Wells Fargo has identified

25 evidence that McElroy, who received the deed of trust, believed that there was nothing irregular

26 about the deed of trust.  McElroy Decl., ¶ 4.  In opposition, Plaintiffs have not pointed the

27 Court's attention to any evidence establishing that Wells Fargo recorded the allegedly fraudulent

28 deed with the requisite scienter.

1   Plaintiffs do argue, in opposition, that their claim for slander of title is based not only on

2   the recording of the allegedly false deed, but also on Wells Fargo's commencement of

3   foreclosure proceedings on the deed of trust.  Wells Fargo responds that the latter claim was not

4   asserted in the complaint.  Yet the CAC does allege that: "[Wells Fargo] was also informed that

5   all of the documentation underlying the [Wells Fargo] 2001 Platinum Line, including the

6   promissory note, and the Deed of Trust were forged.  Nonetheless, prior to Christmas in

7   December 2002, [Wells Fargo] initiated a non-judicial foreclosure of the Scarff Residence."

8   CAC ¶ 222.

9   Plaintiffs's opposition papers include a letter, dated December 4, 2002, regarding the

10  foreclosure proceedings initiated on the deed of trust, in which Attorney Heinz Binder states:

11  
12  
13  
14  

> I also appreciate the courtesy extended to me and my client wherein you advised
> that you had begun the process of a non-judicial foreclosure on the Note and Deed
> of Trust encumbering Mr. Scarff's residence.  Likewise, as a courtesy, I have
> advised you that the Note and Deed of Trust are forged instruments.  I have
> previously so advised Mr. Clore.  I have previously so advised Ms. Joyce Jaber.  I
> have previously so advised Mr. Frank Martinez.

15  Gregory Decl. C, Ex. A to Ex. G.[15]  On December 19, 2002, a Notice of Default was recorded

16  against Scarff's residence.  *Id.*, Ex. D to Ex. H.  On March 10, 2003, the Santa Clara Superior

17  Court issued a stipulation and order for preliminary injunction enjoining Wells Fargo from

18  publishing or recording a Notice of Sale against the Residence or taking any action to foreclose

19  on any deed of trust against the Residence.  *Id.*, Ex. I.

20  Although Plaintiffs are correct that the CAC asserts this aspect of their claim, they

21  identify no case in which a foreclosure proceeding in and of itself constitutes slander of title.

22  Moreover, under California law, nonjudicial foreclosure sale proceedings constitute privileged

23  communications.  "Civil Code sections 2924 through 2924k provide a comprehensive framework

24  for the regulation of a nonjudicial foreclosure sale pursuant to a power of sale contained in a deed

25  of trust."  *Moeller v. Lien*, 25 Cal.App.4th 822, 830 (1994).  California Civil Code section 2924

26  

27  
28  
[15] Defendants object to the admission of this evidence, arguing that it is hearsay and that it
is not relevant.  The Court does not rule on this objection, as it includes this evidence for the
exclusive purpose of giving an overview of the alleged facts.

Case No. C 03-03394 JF (PVT) and C 03-04829 JF (PVT)
ORDER RE MOTIONS HEARD ON JANUARY 6, 2006
(JFLC1)

1    establishes that "[t]he mailing, publication, and delivery of notices as required herein, and the

2    performance of the procedures set forth in this article, shall constitute privileged communications

3    within Section 47." The litigation privilege, under California Civil Code section 47, is "absolute

4    in nature." *Silberg v. Anderson*, 50 Cal.3d 205, 215 (1990).

5         Accordingly, Wells Fargo's motion for summary judgment on Scarff and Nancy Scarff's

6    fourteenth claim, for slander of title, will be GRANTED.

7         **g. *Punitive damages***

8         Wells Fargo moves for summary judgment on the issue of punitive damages.  In order to

9    recover punitive damages against a corporation, "an officer, director, or managing agent of the

10   corporation" must have "advance knowledge and conscious disregard, authorization, ratification

11   or act of oppression, fraud, or malice" of "the wrongful conduct for which the damages are

12   awarded," or "was personally guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(b).

13        Wells Fargo has met its burden of pointing out "'that there is an absence of evidence to

14   support'" Plaintiffs' claims for punitive damages. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th

15   Cir. 2001).  While a reasonable jury could infer that Barber had knowledge of Huang's scheme,

16   Wells Fargo has presented evidence that Barber did not hold a management position at the bank.

17   Barber Decl., ¶¶ 3, 4, 15.  Wells Fargo argues, reasonably, that there is not enough evidence from

18   which a jury could infer that Starratt and McElroy, who were Vice Presidents at Wells Fargo, had

19   knowledge of Huang's scheme.  Plaintiffs identify actions by Starratt and McElroy—for

20   example, that they communicated with Huang rather than with Scarff regarding loan transactions

21   and processed an allegedly fraudulent deed of trust—that may have deviated from standard or

22   preferred banking procedures.  However, this is not evidence of, nor have Plaintiffs pointed the

23   Court's attention to evidence of, Starratt's or McElroy's advance knowledge and conscious

24   disregard, authorization, ratification or act of oppression, fraud, or malice of Huang's scheme or

25   was personally guilty of oppression, fraud, or malice.

26        Accordingly, Wells Fargo's motion for summary judgment on the issue of punitive

27   damages will be GRANTED.

28

*h.  Damages limited by statutes of limitation*

For the reasons stated above with respect to Comerica's motion for partial summary adjudication on the issue of damages, Wells Fargo's and Barber's motion for summary judgment on the issue of whether damages should be limited by the applicable statutes of limitations will be DENIED.

**6.  Pentoga**

Intuit et al., joined by Hvegholm, Wells Fargo, and Barber, move for summary judgment on all claims brought by Pentoga on the ground that Pentoga was dissolved before it was first named as a party in the instant case and thus lacks legal capacity to sue.  The instant order disposes of all of the claims alleged by Pentoga.  Accordingly, this aspect of the motions for summary judgment is moot.  However, to assist the parties in evaluating their positions, the Court nonetheless will set forth its reasoning supporting its conclusion that Pentoga lacks the capacity to sue.

Under California law, after dissolution of a limited partnership, "the general partners who have not wrongfully dissolved a limited partnership or, if none, the limited partners, may wind up the limited partnership's affairs."  Cal. Corp. Code § 15683 (a).  A general partner "can bind the partnership . . . [b]y any act appropriate for winding up partnership affairs or completing transactions unfinished at dissolution."  Cal. Corp. Code § 15685(a).  Defendants have provided evidence showing that Pentoga was no longer in the period of winding up on July 21, 2003, when it was first identified as a plaintiff in the instant action.  On December 31, 2000, Pentoga filed a Certificate of Dissolution and a Certificate of Cancellation with the California Secretary of State.  Bass Decl., Ex. 16 (exhibits filed under seal).  According to the California Secretary of State's website, a "A Certificate of Cancellation (Form LP-4/7) is filed by a [sic] either a domestic or foreign limited partnership once all assets have been distributed. This filing officially terminates the limited partnership."  California Business Portal, Limited Partnerships: Frequently Asked

31

1   Questions, http://www.ss.ca.gov/business/lp/lp_faq.htm;[16] *see also*, 4-25 Ballantine and Sterling,

2   California Corporation Laws § 722.04 [2] ("When the winding up of the affairs of the limited

3   partnership has been completed, the general partners must cause a certificate of cancellation of

4   certificate of limited partnership to be filed with the Secretary of State."). Plaintiffs have

5   submitted no evidence that might suggest that Pentoga was no longer in the period of winding up

6   when it first became a plaintiff in the instant action. Accordingly, Pentoga lacks capacity in the

7   instant action.

8

9   **7.   Expert declarations**

10       Wells Fargo, Intuit, CRI, Barber, and Cicotti move to exclude the expert declarations of

11  John Britt ("Britt"), Vicki Lambert ("Lambert"), and David Moore ("Moore"), which were

12  submitted significantly after the expert disclosure deadline in the instant case had passed.

13  Comerica joins in the motion as to the declarations of Britt and Moore. In addition, Hvegholm,

14  in her reply brief to her motion for summary judgment, requests that the Court exclude the expert

15  declaration of Lambert.

16       The Court will DENY the motions to exclude the Lambert and Moore declarations. The

17  Lambert declaration applies only to the alleged "payroll scheme," as to which the Court will

18  grant summary judgment in favor of all Defendants. Accordingly, the motion to exclude the

19  Lambert declaration is moot. The Moore declaration, originally filed as the "Declaration of

20  David S. Moore in Support of Motion for Preliminary Injunction" on February 13, 2003, is

21  identified as "preliminary." Gregory Decl. C, Ex. D. While the Court does not condone the late

22  submission of this expert declaration, there is little evidence that Defendants were harmed by its

23  late submission. Moreover, at oral argument, Defendants represented to the Court that the Moore

24  declaration is not of concern to them. Accordingly, the Court will not exclude the Moore

25  ──────────────

26       [16] Defendants submitted a printed copy of this website as Exhibit 3 to "Request to Take
    Judicial Notice of Matters Supporting Defendants Wells Fargo Bank N.A.'s, Intuit Inc.'s,

27  Computing Resources, Inc.'s, Lisa Ciccotti's, and Carol Barber's Motions for Summary
    Judgment." Although the relevant page was missing from the exhibit, the Court located the

28  relevant language on the California Secretary of State's website.

Case No. C 03-03394 JF (PVT) and C 03-04829 JF (PVT)
ORDER RE MOTIONS HEARD ON JANUARY 6, 2006
(JFLC1)

1    declaration.  Pursuant to Plaintiffs' representations at oral argument, the Moore declaration will

2    be deemed a final, rather than a "preliminary," declaration.

3         The Court will GRANT IN PART and DENY IN PART the motion to exclude the Britt

4    declaration.  The Britt declaration was filed on December 7, 2005, in opposition to Wells Fargo's

5    and Barber's motion for summary judgment, more than four months after the July 15, 2005

6    deadline for Plaintiffs' expert disclosures.  During the September 2, 2005 Case Management

7    Conference, the Court instructed the parties that, in order to obtain an exception to the expert

8    disclosure deadline, a party would need to file a motion and show good cause.  However, despite

9    this clear instruction from the Court, Plaintiffs did not seek permission of the Court to file the

10   Britt declaration after the deadline.  Because this declaration included opinions concerning Wells

11   Fargo that were not included in the earlier-filed Britt declaration, the late filing was not harmless.

12   Accordingly, the Court will exclude the Britt declaration, pursuant to Federal Rule of Civil

13   Procedure 37(c)(1), for the purpose of the instant motions.  However, because the trial date has

14   been postponed until July 7, 2006, and this postponement will allow Defendants to conduct

15   further discovery in relation to the Britt declaration, the Court will not exclude the Britt

16   declaration at trial.

17

18                                   **IV. ORDER**

19        Good cause therefore appearing, IT IS HEREBY ORDERED that Defendants' motions to

20   for summary judgment and to exclude expert declarations will be GRANTED IN PART and

21   DENIED IN PART, as discussed in detail above.  For the parties' convenience, the claims for

22   relief remaining, along with the Plaintiffs that may assert them and the Defendants against whom

23   they may be asserted, are summarized below.

24

25   •    Ninth claim for relief: fraud and deceit—secondary liability only and limited to losses

26        from the alleged "credit line scheme"

27        Plaintiff:       Edward Scarff

28        Defendants:   Wells Fargo, Comerica, Barber, and Burtzel

33

1    •       Eleventh claim for relief: negligence in connection with the alleged "credit line scheme"

2            Plaintiff:      Edward Scarff

3            Defendants:     Comerica and Burtzel

4

5    •       Twelfth claim for relief: liability pursuant to 12 U.S.C. § 503 and 18 U.S.C. § 215 in

6            connection with the alleged "credit line scheme"

7            Plaintiff:      Edward Scarff

8            Defendants:     Barber and Burtzel

9

10   •       Fifteenth claim for relief: declaratory relief—not injunction, restitution, or attorney's fees

11           Plaintiffs:     Edward and Nancy Scarff

12           Defendants:     Wells Fargo and Comerica

13

14

15   DATED: February 23, 2006

16

17

18                                              JEREMY FOGEL
                                                United States District Judge

19

20

21

22

23

24

25

26

27

28

1   This Order has been served upon the following persons:

2   Rebecca M. Archer            EfilingRMA@cpdb.com, rmg@cpdb.com

3   Jonathan R. Bass             EfilingJRB@cpdb.com, mjc@cpdb.com

4   William Bates , III          bill.bates@bingham.com

5   Carolyn Chang                cchang@fenwick.com, vschmitt@fenwick.com

6   A. Marisa Chun               EfilingAMC@cpdb.com, pjd@cpdb.com

7   Joseph W. Cotchett           plee@cpsmlaw.com,

8   Joseph N. Demko              JND@JMBM.com, eap@jmbm.com

9   John W. Easterbrook          jwe@hopkinscarley.com, dgraff@hopkinscarley.com

10  Gilbert Eisenberg            g.eisenberg@sbcglobal.net,

11  William Henry Gavin          gavin@gclitigation.com,

12  Philip L. Gregory            pgregory@cpsmlaw.com, jacosta@cpsmlaw.com

13  Alan F. Hunter               hunter@gclitigation.com,

14  Susan K. Jamison             EfilingSKJ@cpdb.com, aaa@cpdb.com

15  William S. Klein             bklein@hopkinscarley.com, ttellez@hopkinscarley.com

16  Martin H. Kresse             mkresse1@earthlink.net,

17  C. Laine Lucas               lainelucas@bindermalter.com,

18  Julian W. Mack               pmack@ buchalter.com,

19  Frank M. Pitre               fpitre@cpsmlaw.com, mnewman@cpsmlaw.com;
                                 rmanuel@cpsmlaw.com
20
21  Elizabeth C Pritzker         epritzker@cpsmlaw.com, zml@girardgibbs.com

    Dori Lynn Yob                dyob@hopkinscarley.com, ash@hopkinscarley.com
22

23  Peter G. Bertrand
    Buchalter Nemer Fields & Younger
24  333 Market Street, 29th Floor
    San Francisco, CA 94105-2130
25

26  Heinz Binder
    Binder & Malter LLP
27  2775 Park Avenue
    Santa Clara, CA 95050
28

Case No. C 03-03394 JF (PVT) and C 03-04829 JF (PVT)
ORDER RE MOTIONS HEARD ON JANUARY 6, 2006
(JFLC1)

1  Jennifer Coleman
   Jeffer Mangels Butler & Marmaro LLP
2  Two Embarcadero Center
   Fifth Floor
3  San Francisco, CA 94111-3824

4  Tod C. Gurney
   Hopkins & Carley
5  70 S. First Street
   San Jose, CA 95113
6  tgurney@hopkinscarley.com, ttellez@hopkinscarley.com

7  Robert G. Harris
   Binder & Malter, LLP
8  2775 Park Avenue
   Santa Clara, CA 95050
9
   Nanci E. Nishimura
10 Cotchett Pitre Simon & McCarthy
   840 Malcolm Road
11
   USBC Manager-San Jose
12 US Bankruptcy Court
   280 South First Street
13 Room 3035
   San Jose, CA 95113
14
   Arthur S. Weissbrodt
15 U.S. Bankruptcy Court
   280 South First Street
16 Room 3035
   San Jose, CA 95113
17 Suite 200
   Burlingame, CA 94010
18
19
20
21
22
23
24
25
26
27
28

Case No. C 03-03394 JF (PVT) and C 03-04829 JF (PVT)
ORDER RE MOTIONS HEARD ON JANUARY 6, 2006
(JFLC1)