**E-Filed 1/13/10**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| EDWARD L. SCARFF, et al., | Case Number C 03-03394 JF (PVT) |
| Plaintiffs, | C 03-04829 JF (PVT) |
| | C 03-05871 JF (HRL) |
| v. | ORDER[1] GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT |
| WELLS FARGO BANK, N.A., et al., | |
| Defendants. | |

Defendants Intuit Inc. ("Intuit"), Computing Resources Inc. ("CRI"), Lisa Ciccotti ("Ciccotti"), and Kelly Hvegholm ("Hvegholm")[2] (collectively the "Intuit Defendants") move for partial summary judgment on three issues: (1) whether Plaintiff Pentoga Partners ("Pentoga") has capacity to bring claims in this action, (2) whether the Intuit Defendants can be found liable for any fraudulent concealment from Plaintiff Edward Scarff ("Scarff"), and (3) whether Plaintiffs

---

[1] This disposition is not designated for publication in the official reports.

[2] Hvegholm filed her motion separately from the other Intuit Defendants, who filed jointly, but incorporated all of the other Defendants' moving papers and made no additional arguments.
Case No. C 03-03394 JF (PVT), C 03-04829 JF (PVT), and C 03-05871 JF (HRL)
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
(JFLC3)

may pursue a claim for punitive damages against Intuit or CRI.[3] For the reasons discussed below, the motion will be granted in part and denied in part.

## I. BACKGROUND

The facts relevant to the instant motions are summarized in Section II.2.a. of the Court's Order dated February 23, 2006 (Docket #370) ("February 2006 Order") and will not be repeated here. In that Order, the Court granted the Intuit Defendants' motion for summary judgment on Plaintiffs' fraud and conversion claims based on its conclusion that Plaintiffs had failed to establish triable issues of fact as to (1) the damages element of either claim and (2) whether Intuit or CRI could be held liable for actions taken by Ciccotti or Hvegholm under the doctrine of respondeat superior. Because it found those issues dispositive, the Court discussed but did not rule upon the alternative bases for summary judgment proffered by the Intuit Defendants.

Plaintiffs appealed the February 2006 Order on several grounds. The Ninth Circuit affirmed the grant of summary judgment as to the fraud and conversion claims of Plaintiffs Sears & Associates ("SSA") and Pentoga because there was no evidence that these Plaintiffs had suffered damages. However, the Ninth Circuit reversed as to Scarff's fraud and conversion claims, concluding that genuine issues of material fact exist as to whether Scarff had suffered damages and as to whether Intuit and CRI could be held vicariously liable for the acts of Ciccotti and Hvegholm.[4] In a footnote, the court stated that it did not reach the issue of whether Pentoga had capacity to sue.

Following Ninth Circuit's decision, the remaining parties engaged in additional

---

[3] Defendants' original moving papers also sought summary judgment as to Plaintiff Nancy Scarff and as to Plaintiffs' claim for conversion. Because both Plaintiff Nancy Scarff and the conversion claim were dismissed with prejudice by stipulation of the parties (Docket #465), those issues are now moot.

[4] Apparently, in their reply brief to the Ninth Circuit, Plaintiffs withdrew their challenges to the grant of summary judgment on the conversion claim. The Ninth Circuit's memorandum disposition does not reflect this withdrawal. Either way, as described in footnote 3 above, the parties have stipulated to the dismissal of that claim. Any issues related to the conversion claim therefore are moot.

discovery, and the Intuit Defendants filed the instant motion. The Court heard oral argument on January 8, 2010.

## II. LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the Court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party meets this initial burden, the burden shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. A genuine issue for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *Anderson*, 477 U.S. 242, 248-49; *Barlow v. Ground*, 943 F.2d 1132, 1134-36 (9th Cir. 1991).

"When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" *Devereaux v. Abbey*, 263 F.3d 1070, (9th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party meets this burden, the nonmoving party may not rest upon mere allegations or denials, but must present evidence sufficient to demonstrate that there is a genuine issue for trial. *Id*.

The standard applied to a motion seeking partial summary judgment is identical to the standard applied to a motion seeking summary judgment of the entire case. *Urantia Foundation v. Maaherra*, 895 F.Supp. 1335, 1335 (D. Ariz. 1995).

//

//

## III. DISCUSSION

**A.    Pentoga's capacity to sue**

The Intuit Defendants first move for summary judgment as to Pentoga on the grounds that the dissolved partnership no longer possesses legal capacity to sue. In its February 2006 Order, though it did not base its ruling on the issue, the Court "set forth its reasoning supporting its conclusion that Pentoga lacks the capacity to sue." (February 2006 Order 31:13-14.) That reasoning is as follows:

> Under California law as it existed at the time the instant action was commenced, after dissolution of a limited partnership, "the general partners who have not wrongfully dissolved a limited partnership or, if none, the limited partners, may wind up the limited partnership's affairs." Cal. Corp. Code § 15683 (a). A general partner "can bind the partnership . . . [b]y any act appropriate for winding up partnership affairs or completing transactions unfinished at dissolution." Cal. Corp. Code § 15685(a). Defendants have provided evidence showing that Pentoga was no longer in the period of winding up on July 21, 2003, when it was first identified as a plaintiff in the instant action. On December 31, 2000, Pentoga filed a Certificate of Dissolution and a Certificate of Cancellation with the California Secretary of State. Bass Decl., Ex. 16 (exhibits filed under seal). According to the California Secretary of State's website, a [sic] "A Certificate of Cancellation (Form LP-4/7) is filed by a [sic] either a domestic or foreign limited partnership once all assets have been distributed. This filing officially terminates the limited partnership." California Business Portal, Limited Partnerships: Frequently Asked Questions, http://www.ss.ca.gov/business/lp/lp_faq.htm;[5] *see also*, 4-25 Ballantine and Sterling, California Corporation Laws § 722.04 [2] ("When the winding up of the affairs of the limited partnership has been completed, the general partners must cause a certificate of cancellation of certificate of limited partnership to be filed with the Secretary of State."). (*Id.* at 31:15-32:7.)[6]

---

[5] Defendants submitted a printed copy of this website as Exhibit 3 to "Request to Take Judicial Notice of Matters Supporting Defendants Wells Fargo Bank N.A.'s, Intuit Inc.'s, Computing Resources, Inc.'s, Lisa Ciccotti's, and Carol Barber's Motions for Summary Judgment." Although the relevant page was missing from the exhibit, the Court located the relevant language on the California Secretary of State's website.

[6] Footnote 5 appears above as it did in the February 2006 Order. Updated to reflect changes to the Secretary of State's website, it should now read: "Defendants submitted a printed copy of this website as it appeared on or about November 8, 2005, in support of their 2005 motion for summary judgment (Docket #300). Although the relevant page was missing from the

Even though they had an opportunity to do so following remand, Plaintiffs have submitted no evidence that might suggest that Pentoga still was in the period of winding up when it first became a plaintiff in the instant action. Accordingly, Pentoga lacks capacity to sue. While Plaintiffs contend that the Court "should find that SSA may prosecute the claims of Pentoga because Pentoga essentially merged into SSA when Pentoga distributed its assets to its partners who then contributed them to SSA," this fact is irrelevant with respect to *Pentoga*'s present capacity to sue. This aspect of the Intuit Defendants' motion will be granted.

### B. Fraudulent concealment by the Intuit Defendants

The Intuit Defendants also move for summary judgment as to Scarff's third claim for secondary liability for fraud and deceit in connection with Carol Huang's ("Huang") alleged "payroll scheme." The elements of fraud and deceit are: (1) a misrepresentation (i.e., false representation, concealment, or nondisclosure), (2) knowledge of the falsity, (3) intent to defraud (i.e., to induce reliance), (4) justifiable reliance, and (5) resulting damage. *Lazar v. Superior Court*, 909 P.2d 981, 984 (Cal. 1996). Where, as here, the claim for fraud and deceit is based specifically on concealment,[7] the elements of the claim are as follows: "(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or

---

exhibit, the Court located the relevant language on the California Secretary of State's website in issuing its February 2006 Order. While the format of the website appears to have changed as of the Court's viewing on January 6, 2010, the relevant content remains substantively the same."

[7]As the Court observed in a previous order, "Plaintiffs point to no allegations in the CAC that Huang made false representations to Plaintiffs in connection with the alleged 'payroll scheme,' and the Court has found none." (Order Granting in Part and Denying in Part Motions to Dismiss and to Strike Portions of the Consolidated Amended Complaint 10 n.20.) In addition, Plaintiffs have not alleged that the Intuit Defendants participated in fraud or deceit by assisting Huang in the breach of any affirmative duty to disclose. Plaintiffs' sole theory of liability is that the Intuit Defendants' actions helped Huang conceal the existence of her scheme. Plaintiffs did not contend otherwise in their briefing or during oral argument.

5

suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*, 7 Cal. Rptr. 2d 859, 864 (Ct. App. 1992).

Scarff alleges that the Intuit Defendants either conspired with Huang fraudulently to conceal the payroll scheme or aided and abetted her concealment of the scheme. The Intuit Defendants argue that summary judgment is appropriate as to this claim for the sole reason that Scarff has failed to present any evidence that the payroll scheme ever was concealed. (Defs.' Mot. for Summ. J. 20:1-3 ("A claim of aiding and abetting fraudulent concealment cannot exist where there was no *concealment* in the first place, and where the thefts were regularly *disclosed* by the Intuit Defendants to their customers (SSA and Pentoga)." (emphasis in original)).) According to the Intuit Defendants, Huang's scheme continued for as long as it did not because Huang concealed it from Scarff, but because Scarff never reviewed his own records:

> Scarff was not prevented from learning about Huang's funds transfers or salary overpayments, nor could Huang have concealed any of that activity from Scarff if she had tried. Huang never prevented Scarff from reviewing the bank and payroll records. Scarff just never looked at them. He gave Huang the sole and exclusive responsibility for receiving, reviewing and reconciling the bank statements and payroll reports, all of which clearly disclosed the details of Huang's activities. He never checked his bank statements and never looked at a payroll report. Huang did not hide her activities at all. The Intuit Defendants certainly never did.

(Defs.' Mot. for Summ. J. 20:8-13 (citations and footnote omitted).) In fact, they argue, the reports Intuit and CRI sent to SSA and Pentoga contained all of the information Scarff would have needed to become aware of the scheme:

> Payroll reports detailing exactly what Huang was doing were regularly delivered to SSA and Pentoga. The reports plainly listed the salary overpayments and Huang's "adjustments." Scarff admitted that, had he reviewed these reports, he would have known what Huang was doing.

(*Id.* at 20:8-13.)

Though Plaintiffs' opposition papers are not entirely clear, it appears that Scarff posits two theories for the concealment element of his fraud claim. First, he argues that Huang concealed the scheme by secreting or "redacting" the portions of the payroll reports that would have indicated the overpayments. This is supported by Huang's deposition testimony:

| | | |
|---|---|---|
| 1 | Q. | [Y]ou said that when you would pick up the payroll, there–it would come with a report, a computerized report, showing the activity and the payroll for that two-week period. Correct? |
| 2 | | |
| 3 | A. | Yes. |
| 4 | Q. | And there would be a page or couple of pages in the report which reflected the amount that you were paid during that period. Let's say it as $60,000 for that period. That figure would appear on the payroll report? |
| 5 | | |
| 6 | A. | Yes. |
| 7 | Q. | You would pick that up at the main branch of Wells Fargo Bank at 465 California Street, correct? |
| 8 | | |
| | A. | The main branch of Wells Fargo, yes. |
| 9 | | |
| 10 | Q. | Yes. And then . . . you would remove the page or pages of that report that showed the inflated payroll amount, and you would discard it? |
| 11 | A. | Yes, I did. |

(Huang Dep. 537: 4-22.) Even accepting that Scarff failed to look for the reports, Huang's testimony alone creates a triable issue as to whether Huang "by concealment or other action intentionally prevent[ed] [Scarff] from acquiring material information" regarding the scheme. Restatement (Second) of Torts § 550 (1977).

Scarff's second theory of concealment is that the Intuit Defendants concealed, or helped Huang to conceal, information regarding the scheme by calculating and "backing out" Huang's overpayments from their system and not reporting the overpayments in the relevant tax forms. Scarff points to deposition testimony tending to establish that the Intuit/CRI employees did not merely record amounts Huang directed them to record but instead calculated the amounts required to achieve the end result Huang desired and then changed them in the payroll company's system. For example, Hvegholm testified about the period following her departure from CRI:

| | | |
|---|---|---|
| 23 | Q. | And you would call in the adjustments, too? |
| 24 | A. | The adjustment amount, the gross amount. I wouldn't know this information. This information was computed by the–calculated out by whoever at the payroll service, and then they would either contact me or contact Carol [Huang] to give the net–the net amount that was due back to the companies. |
| 25 | | |
| 26 | | |
| 27 | Q. | The calculation, though, what calculations would have to occur to figure out where the money– |
| 28 | | |

7

| | | |
|---|---|---|
| 1 | A. | Well– |
| 2 | Q. | –you would have to go back– |
| 3 | A. | –you would figure out if her year-to-date was at "x." and she wanted it to be down to "y." You had to figure out what that difference was, and what the taxes were attached to that–that gross difference in order to put it into–into the payroll system, and then you would arrive at the net pay which was due back at the company. |
| 6 | Q. | And the–and the calculations, to your knowledge, on the most part, was [sic] done by Lisa Ciccotti except for certain time periods that Iris Matthews did the adjustment calculations? |
| 8 | A. | Yes. |

(Hvegholm Dep. 137:23-138:18.)

Scarff also proffers the expert report of Vicki Lambert in support of this theory. In that report, Lambert opines that:

> On each of the inflated payrolls for Carol Huang prepared by the [Intuit] Defendants for the years 1991 to 2002, the taxation for federal income was calculated outside of the accepted standards. The [Intuit] Defendants were required to make a conscious decision to compute Carol Huang's taxation for federal income outside of the accepted standards.

(Lambert 2006 Report ¶ 17.)[8] For example, Lambert shows that the Intuit Defendants withheld $900.00 for federal income tax on a payment of $62,500.00 in 2000 when the federal income amount withheld based on the Form W-4 for an individual claiming ten allowances and filing as a single person should have been $23,331.20. (*Id.* at ¶ 18.) In addition, Lambert concludes that the adjustments the Intuit Defendants made to Huang's wages "were done outside of the standard accepted practices for payroll" and "resulted in incorrect information being furnished to government agencies." (*Id.* at ¶ 22.)

The Court concludes that Scarff has presented triable issues of fact as to whether Huang and the Intuit Defendants manipulated tax documents to conceal material information regarding the payroll scheme from him. Accordingly, this portion of Defendants' motions will be denied.

//

---

[8]Though the Intuit Defendants challenge the admissibility of all of Lambert's 2009 Report as well as other parts of her 2006 report, they do not challenge the excerpts relied upon here.

**C.  Availability of punitive damages against Intuit and CRI**

Intuit and CRI also move for summary judgment on Plaintiffs' punitive damages claim. In order to recover punitive damages against a corporation, "an officer, director, or managing agent of the corporation" must have "advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice" of "the wrongful conduct for which the damages are awarded." Cal. Civ. Code § 3294(b). In California, managing agents have been defined "to include only those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy." *White v. Ultramar, Inc.*, 21 Cal.4th 563, 566-67 (1999). As a threshold issue, Defendants argue that Plaintiffs cannot recover punitive damages against Intuit or CRI because they have not identified an "officer, director, or managing agent" of Intuit or CRI whose acts or omissions support their punitive damages claim.

As the Intuit Defendants highlight in their opening brief, the Consolidated Amended Complaint ("CAC") alleges that Hvegholm and Ciccotti were "managing agents" under California law such that punitive damage liability may be premised on their conduct or knowledge. (*See* CAC ¶ 119.) Understandably, the Intuit Defendants focus their motion on whether either Hvegholm or Ciccotti ever possessed or exercised sufficient policymaking authority to be considered a managing agent under California law.

However, in their opposition papers, Plaintiffs focus not on Hvegholm and Ciccotti but on two other individuals, Susan Story ("Story") and Vance Walker ("Walker"). They claim that Story and Walker "independently approved and designed the CRI/Intuit corporate policy regarding to [sic] the SSA and Pentoga accounts." (Pls.' Opp. to Defs.' Mot. for Summ. J. 23:11-12.) Plaintiffs assert that:

> Since 1974. [sic] Story has held numerous supervisory positions at CRI/Intuit, including (1) Day Shift Supervisor; (2) Qwik Pay Supervisor; (3) Tax Department Supervisor; and (4) Year-End Manager. . . . In 2003, she was deposed as CRI/Intuit's Person Most Knowledgeable. []
> Walker was a supervisor and manager at both CRI and Intuit. . . . At the time Hvegholm left CRI, in 1996, Walker was Hvegholm's direct supervisor. []

(*Id.* at 24:6-13 (emphasis in original) (citations omitted).) Plaintiffs then offer two statements

9

from Hvegholm's deposition testimony as evidence that "Story and Walker exercised their substantial independent authority and judgment in their corporate decision making, and their decisions determined the CRI/Intuit policy related to the SSA and Pentoga accounts." (*Id.* at 24:14-17.) The first involved Story's confirmation that Hvegholm could process payroll for Huang in a certain way. The second involved Walker telling Hvegholm that she could phone in Plaintiffs' payroll after she left the company as long as the client authorized her to do so. Hvegholm testified that in neither did Story or Walker consult with other employees or executives before responding to her inquiries.

As Defendants argue in their reply, while it is clear that Story and Walker acted as Hvegholm's supervisors, there is no evidence to support a conclusion that either of them "was a 'managing agent,' as the Civil Code employs that term." (Defs.' Reply in Supp. of Mot. for Summ. J. 9:2-3.) As the California Supreme Court has held:

> [S]upervisors who have broad discretionary powers and exercise substantial discretionary authority in the corporation could be managing agents. Conversely, supervisors who have no discretionary authority over decisions that ultimately determine corporate policy would not be considered managing agents even though they may have the ability to hire or fire other employees.

*Smith*, 21 Cal. 4th at 577. More recently, the same court clarified this standard:

> When we spoke in *White* about persons having "discretionary authority over . . . corporate policy" (*White*, supra, 21 Cal.4th at p. 577, 88 Cal.Rptr.2d 19, 981 P.2d 944), we were referring to *formal policies that affect a substantial portion of the company* and that are the type likely to come to the attention of corporate leadership. It is this sort of *broad authority* that justifies punishing an entire company for an otherwise isolated act of oppression, fraud, or malice.

*Roby v. McKesson Corp.*, 47 Cal. Rptr. 3rd 773, 795 (emphasis added).

Applying this standard, no reasonable jury could find that Story or Walker acted as a "managing agent" in connection with the alleged wrongdoing of Ciccotti and Hvegholm.[9] As Defendants argue, Plaintiffs have offered nothing to show "that [Story and Walker] were setting payroll policies, as opposed to merely applying a preexisting general policy (of accommodating

---

[9]The fact that Story "was deposed as CRI/Intuit's Person Most Knowledgeable" on issues not specified by Plaintiffs does not alter this conclusion.

customer requests) to specific circumstances, which is precisely what a 'supervisor' does."
(Defs.' Reply in Supp. of Mot. for Summ. J. 9:9-12.)

## IV. ORDER

Good cause therefor appearing, the Intuit Defendants' motion will be granted in part and denied in part as set forth above.[10]

DATED: 1/13/10

JEREMY FOGEL
United States District Judge

---

[10] The Intuit Defendants also filed a list of objections to evidence Plaintiffs offered in support of their opposition to this motion. As none of the proffered evidence affects the disposition of this motion, the Court need not rule on the objections.